## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| GREAT WESTERN | ) | |
| DEVELOPMENT CORP., *et al.*, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | 7:15-CV-02160-LSC |
| v. | ) | |
| | ) | |
| JONATHAN BENISON, *et al.*, | ) | |
| | ) | |
|     Defendants. | ) | |

## MEMORANDUM OF OPINION

## I.  INTRODUCTION

Plaintiffs Great Western Development Corporation, Inc. ("Great Western"), and Ventec LLC ("Ventec") bring this action against Jonathan Benison ("Sheriff Benison"), individually and in his official capacity as Sheriff of Greene County, Alabama; William Nick Underwood ("Underwood"), individually and in his official capacity as a Greene County Commissioner; Young People's Alliance Association for Youth Development Council Inc. (designated in the complaint as Young People's Alliance Organization and hereinafter referred to as "YPAO"); and River's Edge Bingo, LLC ("River's Edge") (collectively "Defendants"), alleging violations of the Equal Protection Clause of the United

States Constitution, conspiracy to deprive Plaintiffs of the equal protection of the laws, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy to violate RICO, tortious interference with contractual and business relations, civil conspiracy, and fraud. Before this Court are:

- Underwood's Motion for Summary Judgment (Doc. 84);
- Great Western's Motion for Summary Judgment on Sheriff Benison's Counterclaim. (Doc. 88);
- Great Western's Motion for Summary Judgment on Underwood's Counterclaim. (Doc. 89);
- Sheriff Benison's Motion for Summary Judgment (Doc. 90);
- YPAO's Motion for Summary Judgment (Doc. 91);
- YPAO's Motion for Leave to File Amended Answer (Doc. 116);
- Underwood's Motions to Withdraw Purported Factual Admissions (Docs. 121 & 128); and
- Great Western's Motion for an Evidentiary Hearing (Doc. 129).

The motions have been briefed and are ripe for review. For the reasons stated below, Great Western's Motions for Summary Judgment on Underwood and Sheriff Benison's Counterclaims (docs. 88 & 89) are due to be granted, while Underwood, Sheriff Benison, and YPAO's Motions for Summary Judgment (docs. 85, 90, & 91) are due to be granted in part and denied in part. Additionally, YPAO's Motion for Leave to File Amended Answer (doc. 116) is due to be denied. Moreover, the Court finds that Underwood's Motions to Withdraw Purported Factual Admissions (docs. 121 & 128) and Great Western's Motion for an Evidentiary Hearing (doc. 129) are due to be terminated as moot.

## II. BACKGROUND[1]

### A. Statement of Facts

In 2003, voters approved a constitutional amendment allowing nonprofit organizations to operate bingo games in Greene County, Alabama. ALA. CONST. AMEND. 743. The amendment charges the sheriff of the county with the duty of promulgating and enforcing rules and regulations for the operation of bingo games in Greene County. (*Id.* at § 3.) In 2011, Sheriff Benison entered office and enacted new rules and regulations for the operation of bingo by non-profit organizations within Greene County. Under these rules, an organization seeking a charity bingo license must file an application with the sheriff and pay a licensing fee for each license year in order to receive a license. Any license denial or non-renewal may be appealed to the Greene County Commission to make a final determination on the matter.

Pursuant to these rules and regulations, James Carter ("Carter"), the Chairman of the Board of Directors of Great Western, applied for a bingo license in

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotations omitted).

March 2011 on Great Western's behalf. Subsequently, in July 2011, Don Baylor ("Baylor"), Ed Frazier ("Frazier"), and Steven Wallace ("Wallace") formed Ventec, and Ventec entered into a Basic Operating Agreement with Great Western.

There is some dispute regarding the content of discussions between Plaintiffs and Sheriff Benison preceding the issuance of the license to Great Western. However, it is undisputed that Great Western received a charity bingo license in October 2011 for a one-year period. After Great Western received its license, Baylor met with Underwood, who served as a Greene County Commissioner from 2011 to 2014, to discuss his plans for Great Western's charity bingo operation. Underwood is one of the founders of YPAO. YPAO is a Greene County charity that at times has operated bingo games in Greene County. Throughout the time in question, Underwood served as both general counsel for and an officer of the organization. During his meetings with Underwood, Baylor, according to his deposition testimony, shared confidential information about Great Western's bingo project without knowledge that Underwood was involved with YPAO. Underwood, in his role as a Greene County Commissioner, was involved

not only with the appeal of bingo license denials but also with setting the sheriff's budget in Greene County.[2]

After the issuance of the license, Great Western made plans to start a bingo operation on the Hay Field property using the Plantation House as a "temporary facility." Although Plaintiffs attempted to secure adequate funding to build a larger bingo facility, they were unsuccessful. As a result, Plaintiffs began to renovate the Plantation House with the goal of opening in April 2012.

In March of 2012, Sheriff Benison had his attorney, Flint Liddon ("Liddon") send a letter to Plaintiffs stating that he would not approve of a bingo operation at the Plantation House. Liddon then sent additional correspondence to Plaintiffs indicating that Sheriff Benison took issue both with the location of the site and the use of a temporary facility. In these letters, Liddon, at the direction of Sheriff Benison, specifically informed Plaintiffs that "…the piece of property close to the Knoxville exit on Highway 59 is not considered by the Sheriff to be an appropriate place to house bingo operations, and [Sheriff Benison] will not allow any such operations at that location." (Doc. 86 Ex. V.)

---

[2] Although the parties dispute the extent of control Underwood had over Sheriff Benison's budget, Ala. Code § 11-8-3 provides that the County Commission will prepare and adopt budgets, including the sheriffs. Therefore, the record does indicate that Underwood did in fact play some role in setting the budget.

Great Western asserts that it responded to this correspondence by "reminding the sheriff [that] in their initial discussions it was agreed that the Plantation House would serve as a temporary site" for operations. (Doc. 86 Ex. W.) Plaintiffs continued to work on the Plantation House, while they also sought investors to further support their renovations. However, at least one attempt by Plaintiffs to recruit investors was disrupted by Sheriff Benison's Deputies, who arrived at the Plantation House and interrupted the pitch based on a call they allegedly received about an ongoing break in at the site. Additionally, negotiations with Ken Hobbs ("Hobbs"), who was another potential investor, did not come into fruition. Instead, Hobbs later formed a partnership with YPAO and Underwood.

In September of 2012, Sheriff Benison again informed Plaintiffs that they would not be allowed to operate their bingo facility at the Plantation House. However, Sheriff Benison allowed Plaintiffs to move to the Blue Block construction site elsewhere on the Hay Field property. On October 11, 2012, Great Western applied for a renewal of its charity bingo license, which was set to expire on October 22, 2012.

During the pendency of Plaintiffs' license renewal, YPAO and Underwood entered into an agreement with Hobbs to expand YPAO's bingo operation. At the time YPAO was operating out of the Comfort Inn, though it had been looking to

expand or renovate that location. It was shortly after this agreement was entered into that Plaintiffs' application for a license renewal was denied. Plaintiffs appealed Sheriff Benison's decision to the Greene County Commission on January 8, 2013. Evidence in the record suggests that Underwood, who was at the time the Chairman of the Greene County Commission and a member of a charity bingo partnership with Hobbs and YPAO, presided over the appeal.

While its appeal was pending, Great Western continued construction on the Blue Block site. Jim Woods, a member of Ventec, claims that it was at this time that Sheriff Benison approached him at the site and asked him what he was building. Woods stated that he was building a "Wal-Mart." However, Woods testified that Sheriff Benison knew a bingo hall and not a Wal-Mart was being built. Sheriff Benison in response, according to Woods, stated that a license for a Wal-Mart would be $50,000. (Doc. 87 Ex. 42.) Woods refused to pay Sheriff Benison the requested funds. The next day some of Sheriff Benison's deputies came by the site and attempted to shut down construction. Plaintiffs ceased construction on the Hay Field property shortly after this incident.

Although Plaintiffs' appeal was still pending, YPAO ceased bingo operations at the Comfort Inn and made plans to move elsewhere. It is disputed as to when YPAO entered discussions with Sheriff Benison about moving to the land vacated

by Great Western, where River's Edge would ultimately be located. However, the evidence indicates that Plaintiffs withdrew their appeal in March 2013 and that construction for YPAO's River's Edge bingo facility began shortly after that in April 2013. Although Plaintiffs attempted to reinstate their appeal in May 2013, only one Commissioner moved to reinstate the appeal, and thus the appeal was dismissed.

Sheriff Benison officially transferred YPAO's bingo license to the River's Edge location in August 2013 when the facility was nearly complete. River's Edge was officially opened to the public in December of 2013. River's Edge operated until March 2014 when it was closed because it was raided by state law enforcement officials. River's Edge reopened in August 2014 after receiving a loan of $375,000 from Underwood. However, River's Edge closed again in May 2015, when the operators of the bingo hall took all the equipment. At this point, Underwood again loaned money to River's Edge to enable it to reopen and was then hired as the general manager of River's Edge.

During the operation of River's Edge, payments were made by YPAO to Jake Enterprise Group ("Jake Enterprise"), amounting to almost $450,000. (Doc. 87 Ex. 47, Ex. 48.) Jake Enterprise is a Wyoming corporation created by Underwood. Plaintiffs have contended that Underwood, Sheriff Benison, Liddon, and Hobbs all

hold an interest in and received payment from Jake Enterprise during YPAO's association with River's Edge.[3] Moreover, Underwood's legal assistant and River's Edge CFO, Takilia Mayfield, testified in her deposition that she was instructed, during YPAO and Underwood's partnership with River's Edge, to backdate Underwood's billings to YPAO in order to make his billed hours match certain amounts of money. Mayfield claims that Underwood, during this time, would bill YPAO for 60 hours or more of work, even though he was providing legal services to other clients. Mayfield also indicated that, during this time, payments were made to a number of fictitious entities by YPAO, for services that were not rendered. River's Edge and YPAO's partnership ceased in 2016.

## B. Procedural History

Great Western initially filed suit in state court in October 2014. That action was removed to federal court and dismissed on March 9, 2015, when Great Western's former counsel failed to respond to a motion to dismiss. (Doc. 101 Ex. 63.) Great Western's former counsel then advised his clients to file a second lawsuit *pro se* on behalf of the corporation. That suit was filed on May 18, 2015, and

---

[3] Underwood failed to make a timely response to Plaintiffs' requests for admissions. As a result, Underwood has admitted by default that these parties own an interest in Jake Enterprise. However, pursuant to the parties' agreement, as stated on the record to this Court on October 11, 2018, these admissions will not be deemed admitted for the purposes of trial.

dismissed on August 13, 2015. (Doc. 101 Ex. 66 at ¶ 12.) The action currently

before this Court was filed on November 25, 2015. (Doc. 1.)

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact[4] and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a

whole could lead a rational trier of fact to find for the nonmoving party." *Id.* A

genuine dispute as to a material fact exists "if the nonmoving party has produced

evidence such that a reasonable factfinder could return a verdict in its favor."

*Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007)

(quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir.

2001)). The trial judge should not weigh the evidence, but determine whether there

are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary

judgment, trial courts must give deference to the nonmoving party by "view[ing]

the materials presented and all factual inferences in the light most favorable to the

nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206,

1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

---

[4]    A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v.
Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015).

(1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## IV.    DISCUSSION

### A. COUNT I & II— RICO

#### 1.    Sheriff Benison in his Official Capacity

Sheriff Benison asserts that he cannot be sued in his official capacity for RICO violations and cites to *Lancaster Community Hospital v. Antelope Valley*

*Hospital District*, 940 F.2d 397, 440 (9th Cir. 1991). The Court agrees as bringing a RICO claim against Sheriff Benison in his official capacity would essentially constitute a suit against the state of Alabama. *See Kentucky v. Graham*, 473 U.S. 159, 167– 68 (1985). However, to the extent that Plaintiffs are seeking recovery from Sheriff Benison in his individual capacity, this determination does not prevent Sheriff Benison from being liable for any RICO violations that were undertaken in his individual capacity.

### 2. Underwood as Agent for YPAO

YPAO argues that it is not liable for any RICO acts because it had no knowledge of Underwood's actions. However, both principal and agent are "deemed to have notice of whatever either has notice of and ought to, in good faith and the exercise of ordinary care and diligence, communicate to the other." Ala. Code § 8-2-8. Therefore, a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer acquires knowledge while acting in the course of his employment within the scope of his authority. *See Am. Cent. Life Ins. Co. v. First Nat'l Bank*, 90 So. 294, 294 (Ala. 1921) A corporation is vicariously liable under RICO for the wrongful acts of its employees "when the acts are: ((1) related to and committed within the course of employment; (2) committed in furtherance [of the business] of the corporation;

and (3) authorized or subsequently acquiesced in by the corporation." *Quick v. Peoples Bank of Cullman Cty.*, 993 F.2d 793, 797 (11th Cir. 1993) (quoting *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir.1987)).

Plaintiffs' claims against YPAO hinge on whether Underwood was acting as an "agent" of YPAO. The Court finds that Plaintiffs have presented sufficient evidence from which a reasonable jury could conclude that Underwood was effectively "acting at all times as YPAO's agent with respect to bingo" and thus had knowledge of his activities. (Doc. 105 at 8.) There is no dispute as to whether Underwood maintained a position as legal counsel of YPAO. (Doc. 85 Ex. S). Moreover, the deposition testimony of Lucy Spann, Chairman of YPAO, indicates that YPAO gave Underwood blanket authority over bingo. (Doc. 87 Ex. 44 at 68-70). Although YPAO claims to have no knowledge regarding Underwood's alleged undue influencing over Sheriff Benison, actual knowledge is not required in order to impute liability to the corporation.[5] Accordingly, RICO liability for the actions of Underwood may be imputed to YPAO.

### 3.    RICO

---

[5]    The Court does however note that a reasonable jury could find that YPAO had knowledge of the actions based on the deposition testimony of Spann, which indicates that she as Chairman of YPAO may have been aware of Underwood's actions, including the formation of Jake Enterprise. Spann, testifying in response to the question "did you know that Jake Enterprise was formed by a group out in Wyoming or Nevada?", stated that she "heard something about some investors in Nevada…" (Doc. 87 Ex. 44 at 76-78).

Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). To establish a violation of §1962(c), there must be proof "that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (quoting *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224 (11th Cir. 2014)). Additionally, a plaintiff must show: "(1) the requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282–83 (11th Cir. 2006) *abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 714–15 (11th Cir. 2014) (internal quotations omitted). When applying the RICO statute, its terms are to be liberally construed to effectuate its remedial purposes. *See Boyle v. United States*, 556 U.S. 938, 944 (2009).

Racketeering activity, commonly referred to as a predicate act, includes "any act or threat involving… bribery… which is chargeable under State law and

punishable by imprisonment for more than a year." 18 U.S.C. § 1961(1). Under

Alabama law, a person commits bribery if:

> (1) he offers, confers, or agrees to confer anything of value upon a
> public servant with the intent that the public servant's vote, opinion,
> judgment, exercise of discretion or other action in his official capacity
> will thereby be corruptly influenced; or
> (2) [w]hile a public servant, he solicits, accepts or agrees to accept any
> pecuniary benefit upon an agreement or understanding that his vote,
> opinion, judgment, exercise of discretion or other action as a public
> servant will thereby be corruptly influenced.

Ala. Code § 13A-10-61 (a). The requisite "intent" for bribery, to

inappropriately influence a public servant, may be established through

circumstantial evidence. *See Jackson v State,* 791 So.2d 979, 1017 (Ala. Crim. App.

2000).

"To successfully allege a pattern of racketeering activity, [Plaintiffs] must

charge that: (1) the defendants committed two or more predicate acts within a ten-

year time span; (2) the predicate acts were related to one another; and (3) the

predicate acts demonstrated criminal conduct of a continuing nature." *Jackson v.*

*BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). Predicate acts are

considered related if the acts "have the same or similar purposes, results,

participants, victims, or methods of commission, or otherwise are interrelated by

distinguishing characteristics and are not isolated events." *H.J. Inc. v. Northwestern*

*Bell Telephone Co.,* 492 U.S. 229, 240 (1989).

The predicate acts must "amount to, or... otherwise constitute a threat of, continuing racketeering activity." *H.J. Inc.*, 492 U.S. at 237. This continuity requirement "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 242. "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.* "Any two predicate acts can be sufficient for the jury to find continuity." *United States v. Browne*, 505 F. 3d 1229, 1260 (11th Cir. 2011).

Close-ended continuity can be demonstrated "by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. Courts have not found closed-ended continuity when "RICO allegations concern only a single scheme with a discrete goal." *Jackson*, 372 F.3d at 1267. However, the Supreme Court has rejected any requirement under RICO for multiple schemes. *See H.J. Inc.,* 492 U.S. at 237, 242 (holding that closed-ended continuity "might encompass multiple predicates within a single scheme that were related....") Open-ended continuity relies on allegations of "the threat of continuity." *Id.* Plaintiffs can demonstrate open-ended continuity through proof that "the racketeering acts themselves include a specific threat of repetition extending

indefinitely into the future," or "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242.

Under 18 U.S.C. § 1961(4), an "enterprise" consists of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact." 18 U.S.C. § 1961(4). The term "enterprise," as used in RICO, includes two categories of associations. See *United States v. Turkette*, 452 U.S. 576, 581 (1981). The first category encompasses "organizations such as corporations and partnerships, and other 'legal entities.'" *Id.* at 581– 82. The second category covers "any union or group of individuals associated in fact although not a legal entity." *Id.*

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 583. It must have the following structural features: "[1] a purpose; [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. While RICO requires an association-in-fact enterprise to have some organizational structure, it "need not have a hierarchal structure or chain of command." *Id.* at 948 (internal quotations omitted); *Turkette*, 453 U.S. at 583 ("evidence of an ongoing organization [may be] formal or informal…."). Moreover, the enterprise's

members do not have to participate throughout the life of the enterprise for the enterprise to be considered a "continuing unit." *United States v. Weinstein*, 762 F.2d 1522, 1537, n. 13 (11th Cir. 1985); *See United States v. Hewes,* 729 F.2d 1302 (11th Cir. 1984).

RICO only provides relief to those who have been injured "by reason of a violation of section 1962." 18 U.S.C. § 1964(c). "The 'by reason of' requirement implicates two concepts: (1) a sufficiently direct injury so that a plaintiff has standing to sue and (2) proximate cause." *Mohawk Indus.*, 465 F.3d at 1287. "When evaluating a RICO claim for proximate causation, the central question [the Court] must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Court*, 547 U.S. at 461 (2006). Therefore, the proximate causation standard requires "some direct relation" between the conduct and the injury to state a claim. *Mohawk Indus.,* 465 F.3d at 1287. Accordingly, the connection "between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect." *Ray*, 836 F.3d at 1349. The fact that an injury is reasonably foreseeable is not sufficient to establish proximate cause in a RICO action. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010) (plurality opinion); *Mohawk Indus.*, 465 F.3d at 1291.

In evaluating whether proximate causation exists, "courts should consider the 'motivating principles' behind the directness component of the proximate-cause standard in RICO cases." *Mohawk Indus.*, 465 F.3d at 1288 (quoting *Anza*, 547 U.S. at 458) (alterations adopted). Motivating principles of the proximate cause standard include (1) "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action"; (2) "the speculative nature of the proceedings that would follow if [the plaintiffs] were permitted to maintain [their] claim"; (3) whether the alleged harm "could have resulted from factors other than [the defendants'] alleged acts of fraud"; (4) "any appreciable risk of duplicative recoveries"; and (5) whether "the immediate victims of [the] alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 458–60.

"Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO." *ADA v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir.2010). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Id.* (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997)). "A plaintiff need not offer

direct evidence of a RICO agreement; the existence of conspiracy 'may be inferred from the conduct of the participants.'" *Id.* (quoting *Republic of Panama*, 119 F.3d at 950).

Here, Plaintiffs have presented sufficient circumstantial evidence from which a jury could find that Sheriff Benison, YPAO, and Underwood committed RICO violations by engaging in at least two predicate acts of bribery. For example, Plaintiffs' evidence indicates, if believed, that Sheriff Benison solicited and accepted money with an understanding that his discretion in terms of bingo licensing would be corruptly influenced. In support of this, Plaintiffs point to Jim Woods's deposition testimony that Sheriff Benison requested a $50,000 payment from him in order for Great Western to operate a bingo hall at the Blue Block location. Woods refused to pay the amount, and the next day Sheriff Benison's Deputies visited the site in an attempt to shut down construction. Based on this evidence a reasonable jury could find that Sheriff Benison was indeed soliciting a bribe from the Plaintiffs in order for them to go forward with construction and receive a renewal of Great Western's charity bingo license.

Additionally, there is evidence from which a reasonable jury could infer that Underwood was receiving unearned legal fees and other improper benefits from YPAO to influence both him and Sheriff Benison. Plaintiffs point to evidence that

during Great Western's attempt to renew its charity bingo license Underwood was serving as the Chairman of the Greene County Commission and was also involved with YPAO, which was running a bingo hall. In his position on the County Commission, Underwood had influence not only over the sheriff's budget but also on appeals from Sheriff Benison's denials of bingo licenses. Moreover, deposition testimony from Great Western's attorney and Mayfield indicates that Underwood did not recuse himself from Great Western's appeal.

Plaintiffs have also pointed to evidence in the record indicating that while Sheriff Benison was deciding whether or not to renew Plaintiffs' license, Underwood entered into a partnership with Hobbs and YPAO. Sheriff Benison received Great Western's application for a renewed charity bingo license on October 12, 2012. (Doc. 87 Ex. 26.) Hobbs, YPAO, and Underwood entered into a bingo partnership on November 26, 2012. (Doc. 87 Ex. 11 at 93-94.) This is the same partnership that is alleged to have later paid out funds to Sheriff Benison through an entity Underwood created called Jake Enterprise. On December 12, just sixteen days after Hobbs, Underwood, and YPAO formed their partnership, Sheriff Benison denied Plaintiffs' license renewal application. (Doc. 87 Ex. 27.) The evidence also indicates that after this denial YPAO was permitted to move onto the Hay Field property, once used by Great Western, even though Sheriff Benison had

declared that property unfit for bingo in his March 2012 letter. Underwood in his own deposition testimony indicated that "there could be some suspicion [about the alleged timing of YPAO's partnership and Great Western's license denial], given the lapse in time." (Doc. 87 Ex. 11 at 118.)

Mayfield's deposition testimony also indicates that after YPAO began operating at River's Edge Underwood began billing YPAO for more than sixty hours of work per week while also billing for legal work not affiliated with YPAO. (Doc. 87 Ex. 38 at 25.) Mayfield further testified that during this time she was instructed by Underwood to make sure that billings equaled a certain amount of money instead of billing at an hourly rate. (*Id.* at 24.) Although this may not be dispositive of payments being made for an unlawful purpose (i.e. bribery), this manner of billing is circumstantial evidence pointing to such conduct.

Additionally, there is evidence that during this time Underwood was receiving "compensatory tickets" from YPAO "every day except Sunday." (*Id.* at 43-44.) These compensatory tickets would allow Underwood to play bingo at River's Edge for free and then cash out these tickets for money. Moreover, Mayfield's deposition indicates that other "fictitious companies" were allegedly receiving funds from YPAO, even though the companies rendered no services for YPAO. (*Id.* at 88, 115-117.) Mayfield stated in her deposition that she was often

instructed to draft "fictitious notes . . . to cover money [Underwood] was receiving" and "was having to go back and back date [those fictitious notes]." (*Id.* at 88, 110-111.)

Mayfield also testified in her deposition that during YPAO and River's Edge's partnership Jake Enterprise—an entity that Underwood, Sheriff Benison, and Liddon allegedly own an interest in[6]— was also receiving 12% of the gross net of profits every week from River's Edge along with proceeds from ATM funds at River 's Edge. (*Id.* at 54, 84.) During her deposition, Mayfield produced text messages from Underwood arguably indicating that Sheriff Benison was receiving a share of the profits from Jake Enterprise. In one text, Underwood requested Mayfield to text him "billings for [Jake Enterprise]" in order to "assign the partnership share out to the sheriff and others." (*Id.* at 65.) Although the term "partnership" can be used to mean different things, it is unlikely that an attorney practicing for as long as Underwood would use the term to mean anything other than an actual partnership in the entity. Invoices from Jake Enterprise to YPAO indicate that YPAO paid approximately $450,000 to Jake Enterprise between September 2015 and March 2016. (Doc. 87 Ex. 47, Ex. 48.)

---

[6]      Underwood has admitted that Sheriff Benison and others own an interest in Jake Enterprise by default. However, pursuant to the parties' agreement, as stated on the record to this Court on October 11, 2018, this fact will not be deemed admitted for the purposes of trial.

Furthermore, Mayfield testified in her deposition that she was once directed by Underwood "to take $5,000 cash out [of the vault] for the Sheriff." (Doc. 87 Ex. 38 at 103.) This pattern of behavior is corroborated by Hobbs who testified in his deposition that Underwood asked him to give money to the sheriff in "two or three conversations." (Doc. 87 Ex. 10 at 238-240.) Hobbs also testified that both Mayfield and Julia Carter, the operations manager of YPAO, reported to him that deputies had tried to collect money to be given to the sheriff. (*Id.* at 241.) Underwood also admits in his own deposition that he once gave Hobbs $14,400 in cash to give to Sheriff Benison. (Doc. 87 Ex. 11 at 205-12.) In addition, there is evidence in the record that Sheriff Benison's attorney, Liddon, received thousands of dollars from Underwood's personal accounts based upon a twenty-five percent interest Underwood assigned to him in the Kool Kat entity as a referral fee for a motorcycle accident case. (Doc. 87 Ex. 41.)[7]

While there is no direct evidence of Sheriff Benison's intention to accept or solicit these funds, there is evidence that a jury could believe shows that Sheriff Benison both received and requested the funds. It is up to the jury to determine if

---

[7]     In his deposition testimony, Liddon indicated that he did not know where the Kool Kat was or what kind of business it ran. Moreover, Liddon testified that while he was still receiving disbursements from Underwood and serving as counsel for Sheriff Benison he became aware that unlicensed bingo machines had been installed in the Kool Kat, but did not inform Sheriff Benison about that possible unlicensed bingo activity. (Doc. 87 Ex. 41.)

those funds were solicited and paid illegally or otherwise to unduly influence Sheriff Benison and Underwood. If so found, this activity would constitute racketeering activity through multiple predicate acts of bribery.

Therefore, there is sufficient evidence from which a reasonable jury could conclude that two or more related predicate acts occurred within a ten-year period. Moreover, a reasonable jury could find that this evidence indicates that the acts, if they did in fact occur, had the same or similar purpose of not only influencing the approval and denial of bingo licenses in Greene County but also enriching Underwood, Sheriff Benison, and YPAO. Furthermore, a reasonable jury could also conclude from this circumstantial evidence that the Defendants' actions are part of a continuing RICO scheme, especially since Sheriff Benison still controls the bingo licensing process in Greene County.[8]

Additionally, the evidence suggests that an association-in-fact enterprise existed among Sheriff Benison, Liddon, Sheriff Benison's Deputies, and Underwood, acting both on his own behalf and as an agent on behalf of YPAO, with a common purpose of personal gain through bribery in the charity bingo licensing

---

[8] The Court notes that there may also be sufficient evidence for a reasonable jury to conclude that closed-ended continuity existed. Contrary to Sheriff Benison's assertion, there is evidence on the record from which a reasonable jury could conclude that there was more than a single scheme between the parties. Moreover, the three to four year period in which bribes were allegedly exchanged in return for licensing and profits would likely be a sufficient period of time for a reasonable jury to find closed-ended continuity. *See Jackson*, 372 F.3d at 1266.

process.[9] Plaintiffs point to evidence that, if true, suggests that Underwood, YPAO, Sheriff Benison, and others benefitted not only from influencing the charity bingo licensing process but also from the subsequent bingo operations by YPAO at River's Edge.[10] Plaintiffs have also presented evidence indicating that there were personal relationships among the Defendants as YPAO, Underwood, and Sheriff Benison, the ultimate administrator of bingo in Greene County, interacted as both administrators of and applicants for bingo licenses. Although neither party proffers a lifespan for the enterprise, Plaintiffs' evidence suggests that an association-in-fact enterprise was created for the common purpose of enriching its members sometime in 2012 and that it continued until YPAO and River's Edge's partnership ceased in 2016. A reasonable jury could find that this evidence shows that an association-in-fact enterprise with sufficient longevity to achieve a common purpose had formed, even though some members appear to have joined later than others.

Defendants argue that Ventec lacks sufficient standing to bring suit because they were "merely a third-party that could have potentially benefitted from Great

---

[9]    The Eleventh Circuit has held "that plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees." *Ray,* 836 F. 3d 1340. However, the rule is not applicable here as Plaintiffs have alleged an enterprise that includes not only Underwood and YPAO but also Sheriff Benison and others.

[10]    "[T]he proof used to establish [an enterprise and a pattern of racketeering activity] may in particular cases coalesce." *United States v Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983).

Western's bingo license." However, evidence in the record indicates that there was a vending contract in place between Great Western and Ventec at the time Great Western's license renewal was denied.(Doc. 86 Ex. J at 3). Thus, contrary to Defendants' assertion, Ventec sustained a loss and has standing.

Additionally, Defendants contend that proximate causation cannot be established because Plaintiffs' RICO claim "necessarily relies upon proof of undue influence on Sheriff Benison," which all Defendants deny. However, as discussed above, Plaintiffs have presented sufficient circumstantial evidence, if true, from which a reasonable jury could conclude that Sheriff Benison solicited bribes and was in fact unduly influenced by Underwood acting on his own behalf and on behalf of others. Moreover, a reasonable jury could conclude that Underwood, as Chairman of the Greene County Commission, used his position as Chairman to influence Sheriff Benison, proximately causing Plaintiffs' losses.

Although some of Plaintiffs' harms were arguably caused by only one predicate act, Sheriff Benison's alleged request for a bribe, RICO does not require "that a plaintiff be injured by more than one predicate act." *Jones v. Childers*, 18 F. 3d 899, 914 (11th Cir. 1994) (quoting *Banks v. Wolk*, 918 F.2d 418, 424-25 (3d Cir.1990)). Furthermore, Plaintiffs are not alleging a series of remote actions, which resulted in lost profits or harms to the community in general. Instead,

Plaintiffs allege that they are the immediate victims of the alleged acts and that some of these acts directly caused a loss of profits and a denial of Great Western's bingo license.

Concerns about whether the "alleged harm could have resulted from factors other than the [defendants'] alleged acts," do support assertions that proximate causation will not ultimately be proven to the satisfaction of the jury. In particular, Defendants have presented evidence that Plaintiffs' business was possibly underfunded, poorly managed, or illegal. However, it is undisputed that Great Western was operating until its license was denied and Sheriff Benison's deputies shut down the Blue Block site.

Moreover, Defendants are not entitled to summary judgment on Plaintiffs' RICO conspiracy claim because a reasonably jury could find that Underwood, Sheriff Benison, and YPAO had an overall agreement to deny Plaintiffs' license renewal and profit from YPAO's River's Edge bingo hall, located on the property once used by Plaintiffs. The Plaintiffs have presented evidence indicating that they showed both Sheriff Benison and Underwood their plans for development and that it was not until YPAO and Underwood reached an agreement with Hobbs to open River's Edge that Sheriff Benison took action to deny Plaintiffs' renewal application. Additionally, this same evidence along with the evidence of Sheriff

Benison's financial gain could be seen by a reasonable jury to show an agreement to commit at least two predicate acts of bribery where Sheriff Benison, YPAO, and Underwood agreed to exchange money for influence to deny Plaintiffs' license and profit from YPAO's use of the Plaintiffs' former location. Therefore, Defendants' motions for summary judgment on Plaintiffs' RICO claims are due to be denied.

## B. Statute of Limitations

### 1. Section 1983 Claims

"All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought." *Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008) (quotation omitted). In Alabama, where Plaintiffs brought this action, that limitations period is two years. *See Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989). When a § 1983 claim accrues is a question of federal, not state, law. *See Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir.1987). "Section 1983 actions do not accrue until the plaintiff knows or has reason to know that he has been injured." *Id.* Therefore, the statute of limitations runs once "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Id.*

Plaintiffs' § 1983 claims are time barred. Plaintiffs claim that they could not have been aware of their claims until River's Edge opened in December 2013. However, the construction for River's Edge on the property once used by Plaintiffs was already underway in April 2013. A reasonably prudent person, upon witnessing the construction of a bingo hall on the same location that was denied to him, would have been aware of facts which would support a cause of action for an equal protection violation. Moreover, Hobbs's deposition testimony indicates that Baylor knew of River's Edge in August of 2013. Therefore, the evidence in the record indicates that the statute of limitations for Plaintiffs' § 1983 claim started to run in August 2013, at the latest. Because Plaintiffs did not file suit until November of 2015, Plaintiffs' § 1983 claim is barred by the two-year statute of limitations.

To succeed on a § 1983 conspiracy claim, the plaintiff must establish an underlying constitutional violation. *See Grider v City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010). However, as discussed above, Plaintiffs' underlying constitutional claims are barred by the statute of limitations. Therefore, Defendants are also entitled to summary judgment in their favor on Plaintiffs' § 1983 conspiracy claim.

## 2.    State Law Claims

Actions for tortious interference are subject to a two-year statute of limitation. Ala. Code § 6-2-38(l). The statute of limitations accrues and begins to run when the plaintiff's first legal injury occurs. *Ex parte Floyd*, 796 So.2d 303, 308 (Ala. 2001). "When a claim accrues, for statute of limitations purposes, is a question of law if the facts are undisputed and the evidence warrants but one conclusion. However, when a disputed issue of fact is raised, the determination of the date of accrual of a cause of action for statute of limitations purposes is a question of fact to be submitted to and decided by a jury." *Jim Walter Homes, Inc. v. Kendrick*, 810 So.2d 645 (Ala. 2001)(citing *Kindred v. Burlington Northern R.R.*, 742 So.2d 155, 157(Ala. 1999) ).

Although the parties dispute the exact time when Plaintiffs first suffered their injury for the purposes of Plaintiffs' tortious interference claim, the Court finds that there is no evidence in the record from which a reasonable jury could conclude that Plaintiffs first suffered legal injury for the purposes of their tortious interference claim any later than the denial of their re-instated appeal before the Greene County Commission in May 2013. Arguably, Plaintiffs' injury accrued even earlier in December 2012 when Sheriff Benison returned the license fee to Plaintiffs and informed them that he would not renew Great Western's bingo license. Because the statute of limitations begins to run on the date of the legal injury, not

the date where the Plaintiff had knowledge of all parties involved or causing the harm, Plaintiffs would have had to bring their claim for tortious interference, at the latest, by May 2015. However, Plaintiffs filed this suit in November 2015 and therefore Plaintiffs' claim for tortious interference is barred by the statute of limitations.

Similarly, Plaintiffs' fraud and civil conspiracy claims are also time barred. "In Alabama, any fraud claim must be brought within two years of the accrual of the claim." *Auto–Owners Ins. Co. v. Abston*, 822 So.2d 1187, 1194 (Ala.2001) (citing Ala.Code § 6–2–38(l)). However, "the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud." Ala.Code § 6–2–3. More specifically, "the limitations period begins to run when the plaintiff [becomes] privy to facts which would 'provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.'" *Abston*, 822 So.2d at 1195 (second alteration in original) (quoting *Willcutt v. Union Oil Co.*, 432 So.2d 1217, 1219 (Ala.1983)). This statute of limitations also applies to civil conspiracy claims. *Boyce v. Cassese*, 941 So.2d 932, 944 (Ala. 2006). Although "the question of when a party discovered or should have discovered the fraud is generally one for the jury," *Gilmore v. M&B Realty Co., L.L.C.*, 895 So. 2d 200, 210 (Ala. 2004) (quoting *Liberty Nat'l Life Ins.*

*Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997)), the question of when a plaintiff discovered or should have discovered fraud may be decided as a matter of law in cases where "the plaintiff actually knew of facts that would have put a reasonable person on notice of the fraud." *Ex parte Alabama Farmers Co-op, Inc.*, 911 So. 2d 696, 703 (Ala. 2004) (quoting *Barlow v. Liberty Nat'l Life Ins. Co.*, 708 So. 2d 168, 173, 174 (Ala. Civ. App. 1997)).

Plaintiffs' discovery of the facts constituting fraud should have occurred prior to River's Edge's opening in December 2013. A reasonable person would have been put on notice of the fraudulent behavior when the construction for a new bingo facility began and was well underway on the same site that Plaintiffs were once told was not suitable for bingo. Further, Plaintiffs have presented no evidence that YPAO and Underwood actively concealed their involvement with River's Edge. While there is evidence that Underwood did not disclose his conflict of interest on Great Western's appeal or to Baylor, Plaintiffs could have easily discovered such facts if they had simply inquired into who was building a bingo hall on the land they were told was unfit. Therefore, Plaintiffs' fraud and civil conspiracy claims are barred by the statute of limitations.

Plaintiffs seek to have this Court equitably toll the statute of limitations for their state law claims because they claim Underwood and YPAO concealed their

identities and they have filed prior lawsuits. "[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" as to the filing of his action. *Weaver v. Firestone*, 155 So. 3d 952, 957 (Ala. 2013) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). In other words, "equitable tolling is available in extraordinary circumstances that are beyond the petitioner's control and that are unavoidable even with the exercise of diligence." *Ex parte Ward*, 46 So. 3d 888, 897 (Ala. 2007). When determining whether equitable tolling applies, courts should consider "whether principles of equity would make the rigid application of a limitation period unfair and whether [the plaintiff] has exercised reasonable diligence in investigating and bringing [the] claims." *Weaver*, 155 So. 3d at 958 (quoting *Ex parte Ward*, 46 So. 3d at 897) (internal quotation marks omitted).

Plaintiffs first filed their suit in October 2014. That suit was dismissed in March 2015 when Palintiffs' counsel failed to respond to a motion to dismiss. The Plaintiffs' second suit was filed in May 2015 and dismissed in August 2015. The current action was filed in November 2015. The parties do not debate that the Plaintiffs have been diligently pursuing their rights.

However, there does not appear to be any extraordinary circumstances that prevented the Plaintiffs from filing the appropriate action before the statute of limitations expired. General neglect or negligence of an attorney does not ordinarily rise to the level of "extraordinary circumstances." *See Ward v. State*, 228 So.3d 490 (Ala. Crim. App. 2017). In support of their argument for the "extraordinary circumstances" element of equitable tolling, Plaintiffs assert that the identity of the injurers was concealed, as was the case in *Weaver v. Firestone. See* 155 So.3d at 952. In *Weaver*, the Alabama Supreme Court allowed equitable tolling of the statute of limitations where, despite the exercise of reasonable diligence, a victim of an assault was unable to discover his injurer's identity within the statutory period due to the defendants' concealment of their identities. *Id*

However, the circumstances of *Weaver* are distinguishable from this case because here the record indicates that Plaintiffs could have discovered the identity of their injurer within the statutory period with reasonable diligence. Plaintiffs certainly would have known that Sheriff Benison was in some way involved because any party building a bingo hall would have had to get his approval to put a bingo hall on that property. Moreover, Plaintiffs' own evidence indicates that they were aware of Underwood's involvement in their appeal. Underwood and YPAO were openly constructing and subsequently operating in the public a bingo hall.

Therefore, Plaintiffs could have easily discovered the identity of their injurers and are unable to carry the burden of proving the existence of any "extraordinary circumstance" that prevented them from ascertaining the identity of their injurers and filing the appropriate action within the two-year statute of limitations.

### C. YPAO's Motion for Leave to Amend Answer

YAPO seeks leave to amend its answer to assert an affirmative defense of illegality. (Doc. 116.) Because the Court finds that the amendment would cause undue delay and prejudice, YPAO's Motion for Leave to Amend Answer is denied.

Under Rule 8(c)(1) of the Federal Rules of Civil Procedure, a party must affirmatively state any affirmative defense in the answer or through a pre-answer motion, including illegality. FED. R. CIV. P. 8(c)(1). Under Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend their answer once as a matter of course within twenty-one days after service of a pleading. Otherwise, the party may amend their pleading "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a). Rule 15(a) further instructs that "[t]he court should freely give leave when justice so requires." *Id.* "[U]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988) (quoting *Dussouy v. Gulf Coast inv. Corp.,* 660 F.2d 594, 598 (5th Cir.

1981)). Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party…, [and] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). When a motion to amend is "filed after the scheduling order's deadline, [Defendant] must first demonstrate good cause [to amend] under Rule 16(b) before [the Court] will consider whether amendment is proper under Rule 15(a)." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998); *See Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1299 (11th Cir. 2007).

YPAO seeks to amend its answer to add an illegality defense well beyond the Court's initial deadline to add claims or defenses, which expired on June 13, 2016. (Doc. 24.)[11] Therefore, YPAO must demonstrate good cause to allow for the amendment. However, YPAO's argument for good cause is unavailing. YPAO's explanation to this Court of why it waited almost three years since the case began and after the close of discovery to amend its answer is simply that it did not think it had to raise illegality as an affirmative defense.

Conveniently, YPAO has filed this motion before the Court has ruled on summary judgment but well after the discovery period has closed and dispositive

---

[11] Although the parties have requested and received a number of extensions, this Court's review of these orders does not indicate that this deadline was ever extended.

motions have been filed and fully briefed. YPAO is correct to assert that certain bingo games are illegal in Alabama as a matter of law. However, this assertion presupposes the establishment of one important fact: that Plaintiffs' bingo was of the kind deemed illegal in Alabama. Neither party has stipulated that these machines are illegal under Alabama law. Moreover, the record does not currently contain sufficient evidence to apply the *Cornerstone* test for the legality of bingo operations in Alabama. *See Barber v. Cornerstone Community Outreach, Inc.*, 42 So.3d 65 (Ala. 2009). Contrary to YPAO's assertion, the *Cornerstone* test is a fact intensive inquiry that requires the Court to analyze six different elements in order to determine whether the gaming machines constituted prohibited machines. *Id*. Therefore, any inquiry into the legality of the operations would likely require the re-opening of discovery. However, allowing the parties to re-open discovery to examine the illegality of the proposed operations would cause both delay of trial and deprivation of resources. YPAO had knowledge of the questionable legal status of the bingo operations but failed to assert it and rely on it until after discovery was closed.

YPAO nevertheless argues that the good cause standard is met because Alabama Supreme Court precedent suggests that this sort of amendment may be allowed. YPAO in support of its motion cites *Limestone Creek Developers, LLC v.*

*Trapp*, 107 So.3d 189, 193 (Ala. 2012), for the proposition that amendment may be allowed to assert illegality. However, Alabama Supreme Court precedent is not binding in federal district court when applying the Federal Rules of Civil Procedure, unless listed under Rule 81(a). FED. R. CIV. P. 81(a); *see Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530 (11th Cir. 1983). This Court is bound by the Federal Rules of Civil Procedure,  and  YPAO's request for leave to amend answer is due to be denied based on the lack of diligence by YPAO in amending its answer and the prejudice that would result from re-opening discovery at this stage in the litigation.

Plaintiffs, in response to YPAO's argument that amendment should be allowed, seek to have the Court apply judicial estoppel to YPAO's illegality defense. "Judicial estoppel is an equitable doctrine invoked at a court's discretion." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)) *overruled in part on other grounds by Slater v. United States Steel Corp.,* 871 F.3d 1174 (2017) (en banc). Application of the judicial estoppel doctrine prevents a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Burnes*, 291 F.3d at 1285 (quoting 18 James Wm. Moore et al., *Moore's Federal Practice* § 134.30, p. 134–62 (3d ed. 2000)). The purpose of the

doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749–50. Because judicial estoppel protects the process, not a specific party, the one asserting the doctrine need not show that it detrimentally relied on the other party's previous assertions or even that it was involved in the previous proceeding. *Burnes*, 291 F.3d at 1286.

The Eleventh Circuit has established two factors which predominate in applying judicial estoppel to a particular case. *Burnes*, 291 F.3d at 1285 (noting that the "two factors applied in the Eleventh Circuit are consistent with the Supreme Court's instructions" in *New Hampshire*); *Barger v. City of Cartersville*, 348 F.3d 1289, 1293 (11th Cir. 2003). First, a party's allegedly inconsistent position must have been "made under oath in a prior proceeding." *Burnes*, 291 F. 3d at 1285 (quoting *Salomon Smith Barney, Inc. v. Harvey*, 260 F.3d 1302, 1308 (11th Cir. 2001)). Then, the "inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Id.* "[T]hese two enumerated factors are not inflexible or exhaustive; rather, courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of this doctrine." *Id.* at 1286.

The record indicates that the asserted illegality defense in this suit is inconsistent with YPAO's position taken under oath in at least one different proceeding.[12] Thus, the only remaining question is whether the inconsistent positions of YPAO were "calculated to make a mockery of the judicial system." *Burnes*, 291 F.3d at 1285 (11th Cir. 2002). The Eleventh Circuit has stated that judicial estoppel may only apply in situations involving intentional contradictions, "not simple error or inadvertence." *Id.* at 1286.

In this case, YPAO's failure to assert an illegality defense is not the result of simple error or inadvertence. YPAO initially did not assert any illegality defense in this matter. YPAO then filed suit against Hobbs and other investors on the contract underlying the River's Edge bingo project on March 14, 2018. (Doc. 112 Ex. A.) On May 2, 2018, YPAO applied for and received an entry of default against Hobbs and others. (*Id.* at Ex. B-Ex. E.) Two days later, on May 4, 2018, in its initial brief for summary judgment, YPAO raised the defense of illegality for the first time. (Doc. 91.) Even then, YPAO did not move to amend its answer and add the defense of illegality until it filed its reply brief on June 5, 2018 (Doc. 116.)

Essentially, YPAO now seeks to escape liability on the grounds that the profits Great Western lost were illegal gambling profits. However, the fact is not

---

[12]     YPAO sued Hobb's and other investors on the contract between the parties underlying YPAO's operation of River's Edge in Alabama State Court on March 14, 2018. (Doc. 112 Ex. A).

lost on this Court that YPAO, until recently, engaged in the same activity it now contends is illegal. Although YPAO argues that there is no intentional manipulation because it had different counsel in each matter, the Court finds this argument unavailing. Courts often apply judicial estoppel in the context of claims brought after bankruptcy where the party has often had different lawyers. It would make a mockery of the judicial system if YAPO was now allowed to amend its answer and add an illegality defense to potentially escape liability for losses related to bingo shortly after benefitting from a suit enforcing a contract and liabilities emerging from the very same bingo operations they now claim are illegal. Therefore, the Court finds that YPAO is judicially estopped from asserting a defense of illegality.

### D. Underwood and Sheriff Benison's Defamation Counterclaims

To make out a defamation case under Alabama law, "the plaintiff must show that the defendant was at least negligent, in publishing a false and defamatory statement to another concerning the plaintiff, which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085, 1091 (Ala.1998) (internal citations omitted). "Spoken words that impute to the person of whom they are spoken the commission of an indictable criminal offense involving infamy or moral turpitude constitute slander actionable

per se." *Id.* (*citing Ceravolo v. Brown*, 364 So.2d 1155 (Ala.1978)). However in defamation claims, communications made in the course of judicial proceedings are absolutely privileged if they are relevant or material to the litigation. *O'Barr v. Feist*, 296 So.2d 152, 156 (Ala.1974). The standard for relevance is not stringent "and all doubts are resolved in favor of its relevancy or pertinence." *Adams v. Alabama Lime & Stone Corporation*, 142 So. 424, 425 (Ala. 1932). Statements that are relevant or material to the litigation cannot be used as grounds for a defamation claim. *See O'Barr*, 296 So.2d at 157.

Both Underwood and Sheriff Benison base their defamation counterclaims on the allegations of bribery, racketeering, and other illegal activity contained in Great Western and Ventec's amended complaint. However, these statements in the amended complaint are both relevant and material as to whether Sheriff Benison or Underwood violated Alabama's bribery statutes and whether one or both of them were engaged in a pattern of "racketeering activity" in violation of 18 U.S.C. § 1962 (c) and §1962 (d). Both Underwood and Sheriff Benison were unable in their depositions to provide any additional evidence of defamatory statements made by Great Western or Ventec beyond those made in the amended complaint. Therefore, the statements Sheriff Benison and Underwood claim are

defamatory are in fact absolutely privileged and cannot serve as a basis for a defamation claim.

Although Underwood argues that Great Western and Ventec's allegations should not be absolutely privileged because their lawsuit is baseless, Alabama law does not support this conclusion. In support of his argument, Underwood cites *Walker v. Majors*, 496 So.2d 726 (Ala. 1986) for the premise that there is no absolute privilege when a lawsuit was not "contemplated in good faith and submitted under serious consideration." *Id.* at 729. But the language Underwood cites from *Walker* concerns "communications preliminary to the proposed judicial proceeding" not statements made during litigation or at the commencement of the litigation. *Id.* Moreover, the letters sought to be privileged in *Walker* were sent before the plaintiff filed suit. *Id.* Here, there are no statements made prior to the filing of suit. In fact, the only statements alleged to be defamatory were made in the suit. Therefore, Great Western is entitled to summary judgment in its favor on both Underwood and Sheriff Benison's counterclaims.

## VI. Conclusion

For the reasons stated above, Underwood, YPAO, and Sheriff Benison's Motions for Summary Judgment (docs. 84, 90, & 91) are due to be granted as to Counts III-VII of the amended complaint and denied as to Count I-II of the

amended complaint. Great Western's Motions for Summary Judgment (docs. 88 & 89) on Underwood and Sheriff Benison's Counterclaims are due to be granted.

Additionally, YPAO's Motion to Amend Answer (doc. 116) is due to be denied.

Underwood's Motions to Withdraw Purported Factual Admissions (Docs. 121 & 128) and Great Western's Motion for an Evidentiary Hearing (Doc. 129) are due to be terminated as moot.[13]

An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on October 29, 2018.

L. Scott Coogler
United States District Judge

195126

---

[13] These motions were rendered moot by the parties' agreement as stated on the record to this Court on October 11, 2018.